Is council here for a unilock against big fish? Okay, this is number 182186 Unilock USA Incorporated against big fish games Incorporated. Mr. Foster. Thank you, Your Honor. This is a one-on-one case. In 2014, the Supreme Court handed down the Alice case which held invalid for patenting a computer product for mitigating settlement risk. That was based in part on the Bilski case, which held invalid a computer product for hedging against financial risks. The Alice case set off a large expansion of this court's jurisdiction. By my count through last week, there have been 52 presidential decisions dealing with the abstract idea exception. The most important, which in my view, is the Enfish case, which made a distinction between using computers as a tool for affecting other results, such as an Alice and a Bilski, or improvements in computers' functionality themselves. I think the Bilski thing was expanded by some language in the SAP case to include computer networks as well. The two patents involved in this case are IBM patents. One was applied for in 1994, the other in 2000. They were directed towards, in one case, the improvement in computer functionality, and in the other case, the improvement in how a network is used to upgrade computer programs. I can talk about either one first, but in the absence of direction, I will start with the 228 patent, which was the IBM patent applied for in 1994, directed towards updating programs, fixing bug fixes over a network. The specific solution that IBM developed and claimed was a series of various steps where at a remote node, a user would be presented with an interface, would make optional service instructions. Those would be transmitted to a central facility. The central facility would do service research to determine what had been done at that location in the past with that program, would make a determination of what would need to be done. Of course, it would relate that to the instructions they had been given, and would make the fix, if that had been requested, and send an executable code back to the remote location. Clearly, it's something having to do with the effectiveness of the computer network itself. It's not using... How does that improve computer functionality? Excuse me? How does that improve computer functionality? It improves the network functionality, Your Honor. The ability of the network to... But these are generic computers, correct? Yes, certainly. And they're not... They remain generic as a result? They're generic computers. Well, one of the things we all understand is that when you're improving a network in order to make the invention useful, it has to be useful to whoever's on the network, and there are going to be a lot of generic computers there. The claims are not directed to changing the computer itself. It's a change in the programming that is used on the network to affect bug fixes or other revisions. But it doesn't tell you how to do it, right? It just says there's this concept of doing it centrally. It doesn't tell you how. I'm sorry, I... It doesn't tell you how to do it. It just says do it centrally, right? Well, a little bit more than that, Judge Dake. It's certainly done centrally, but in the claims there are various provisions on how to do it. There's an interface which represents the user. Optional service instructions was apparently the point of novelty that the patent office found. Nothing in the prior art had optional service instructions being selected by the user. But no, there's no programming instruction beyond the various steps that are laid out in the claims and in the written description. These were all steps that were carried out by individuals, let's say, on their own. Again, I'm having problems with my hearing aid. You're describing steps that individuals have implemented on their own, upgrading their computer. I'm not sure I would characterize it that way. You have to upgrade the system in order to carry out this invention. It's not just an individual at a node doing it. But when the system's upgraded, it is presented to the user so the user can use the system in order to upgrade their program and to effect bug fixes in the programs the user has. So what's the improvement here? That this does the process automatically? That the user doesn't have to do this individually? The improvement, remember going back to 1994, was at the time there were different operating systems. And depending on the operating system involved, this is a distributed computing operation. And depending on where you are, you have a different operating system. And the problem IBM was faced with was that the way to implement bug fixes would vary depending on the operating system, which is out there in the field. So there's a solution to it, and it is a centralization approach they're using, yes. So what they do is they move the operation into a central place to get around the differing operating steps that are incumbent on any particular operating system out there. So centralization is an operative concept, but they implemented these various steps in order to effect that result. The other patent is the 229 patent, which has to do with moving files. And this is a better computer. Again, this was applied for in the year 2000. And back then, if you, it seems so strange at this point, but to copy files from one location on a computer to another was a time-consuming operation. And sometimes other events would intervene, and so you had to stop the copying. Copying means moving from one location to another and then deleting from the original location. Back then, if you had to stop the copying at any point in the middle and you tried to resume it, you had to resume either from the beginning or there would be a time-consuming process where they would have to inspect the memory cache to see what had to be done. IBM's solution to that was to improve the computer so that it could pick up where it left off without any delay. And they effected that improvement by certain programming changes, including having, as I recall the language, a target directory, a target path, and a file path. When you say improve the computer, you're talking about improving the functionality of the computer. Yes, that's what I meant, Your Honor. Apparently that couldn't be done before 2000. They effected it, and it was an incremental change, to be frank, but an incremental change which was not in the prior art, which the patent office found to be patentable. Again, the way I try to explain eligibility to my non-legal colleagues is that I say if you have mousetraps and if someone designs a better mousetrap which catches more mice, generally that should be eligible. In this case, the computer that IBM designed, the copying function was an improvement over previous computers and therefore under eligibility it should be found to be eligible for patenting. Again, the problem is it doesn't tell you how to do it. It doesn't tell you how to do it. Well, with the 2-9 patent, Judge Dyke, it actually does. In one of the dependent claims that we cited in our brief. Well, let's take claim one first. How does claim one tell you how to do it? Claim one doesn't tell you how to do it. Claim six does, Your Honor. I mean claim five. Five, sorry. So you agree that claim one is unpatentable? No, I wouldn't agree with that, Your Honor. Even though it doesn't tell you how to do it? Well, if you require that level of detail, then you would reach that result, but claim five does have the level of detail. They specify the pointer and then it goes past. But claim, or decision in Intellectual Ventures says that an index is routine, is abstract, right? You're familiar with the Intellectual Ventures case? I read it yesterday, Your Honor. Yes, but that was directed towards a pointer I don't recall in detail. And then, of course, it's at a later date. But in any event, as of this date, the instruction on how to download files is in the patent and it's in claim five. Well, how does this index here make this case different from Intellectual Ventures? I don't remember all the details of Intellectual Ventures, so I don't have it in front of me, Your Honor. Okay. If there are no further questions from the Court, I'll adjourn the rest of my time. Okay, thank you. Mr. Stewart. Thank you, Your Honors. Good morning. May it please the Court. We obviously have a fundamental disagreement with Mr. Foster about the impact that these patents had and certainly the nature of the abstract concepts that are involved. But in both cases, in both patents, what we are dealing with is an abstract concept that has been imported into the realm of the computer world. And so certain things do fall out of that fact. And in both patents, the claims that were identified as representative claims are drafted in functional language. They are results-oriented. They are not a how-to. They are a functional statement. And Judge Dyke, getting directly to your question in regard, for example, to 228, you said, where does it say how to do it? You're absolutely correct that it does not say how to do it. And in fact, Your Honor, if you look at the patent, for example, at column 19, lines 38 to 39, the patent itself says that the exact implementation of the research request, for example, is not critical to the function of the system. Again, at column 22, lines 8 to 10, the exact implementation of the service application is not critical to the function of the system. Column 23, lines 17 to 18, exact implementation of the product installation is not critical to the function of the system. So whether it's an artifact of the time frame from which the specification was drafted or not, the patent as drafted and the claims as drafted do not set out the steps that would be required. The patent does not claim a particular way of programming. It just claims a resultant abstract idea that, as the district court correctly noted, is directed to the provision of customized service from a central site. And the patent itself describes that that concept existed in the prior art. The background of the invention talks about the distribution of code. There were different techniques that you could use to fix code, to roll out fixes. The alleged improvement in this patent was simply allowing a user to customize and select what they would want to improve or what they would want to fix. But, Judge Reyna, getting to your point about efficiency and functionality, there is no guarantee of an improvement in efficiency. There's nothing in the claim, there's no objective measure of efficiency, which frankly is quite subjective as it stands, but there's no guarantee of efficiency gains in this case. There's nothing in the claim that would allow a reader of the patent to determine whether efficiency had been improved. To the contrary, the very nature of the described system might have the opposite result. Because now, instead of having the network administrator who resides at the central location, being in control of the distribution of software, the decisions about what needs to be rolled out, now you have individual users who are checking in to see if there are updates, if they need to have fixes, deciding on their own. That could just as easily bog down the network with additional and unnecessary requests. Why is that a Section 101 consideration? Your Honor, it just goes to the inventive concept and some of the arguments that were made by Unilock in their briefing. Okay. What about the 229 patent? Your Honor, the 229 patent is frankly, to me, a little bit even clearer than the 228, because what you're dealing with in the 229 patent is, as the district court noted, pausing in the middle of copying information and then resuming that process. This is an abstract concept and it's been brought into the... Well, it's more than just a pause button, right? I mean, what the claims are describing is you can pause in the middle of a job, let's say, and whatever you were working on is saved and does not have to be recopied. It seems to me that that's a pretty important economy in computer terms. You're saving time and you're saving extra effort. You're saving computer resources. Well, Your Honor, that concept was present in the prior art and it's described in the background. In column one, for example, at lines 45 to 49, there's a description about how programs that copy files may be able to be paused and then resumed. There might be a need to verify where to pick up or what portion was left over, but that concept existed. And I think that what this patent was directed to and what Unilock certainly focused on was the idea that this freed up the resources of the computer and that that would have an impact. But, in fact, the functionality of the system is not changed. The user's experience might be changed. For example, if an IT employee initiates a massive copying process and wants to leave at 5 p.m. on a Friday, they can press pause and then start that again on Monday morning. But the computer network itself, the computer hardware, the network, still needs to do the work. It's the exact same thing as if I was writing a letter. I put down my pen. I take a break. I come back. I still have to write the rest of the letter. The work has to happen. The resources need to be used. You have to write the rest of the letter, but not what you wrote already. You're right, Your Honor. I don't. But the claim is not directed to verifying that you are picking up the copying process at the point that you left off. That is a function that falls out of using a computer. There are indexes, which, Judge Dyke, as you pointed out, they don't rise to the level of patentability. There are pointers. There are different things that a computer would use that would be different than I might use. For example, I might use, if I were copying something, I might use a notation. I might use a sticky note in a book to indicate where I am. And this is the computer implementation of that, a kind of electronic bookmark. Does that address your question, Your Honor? No. Okay. So with regard to the 229, certainly we believe that it is an abstract concept, the idea of copying information, pausing that process, resuming that process. And the patent just adds conventional computer components to what is not only a well-known business practice, but I think a common practice. If you were to find that this patent does more than just simply pause an operation, a copying operation, but in fact preserves all that you've already copied so it doesn't have to go back and recopy that, would that be an improvement of the functionality of a computer? Well, I don't think so, Your Honor, because in the background it specifically talks about the fact that that existed. The mechanism by which it may have, at least if what's described, I don't know from a novelty perspective if there were other references. Just forget about the 103 question. Okay. Would that be an improvement of the functionality of the computer? Simply being able to return to the point that I – And not having to recopy everything that you've already copied. I don't think so, Your Honor, because that's just the way a computer functions. A computer deals with data – Back when this patent was issued, that's the way all computers function? Well, I mean, this patent is not as old as the – it was not filed as long ago as the other patent. But it is the case that computers allocate data across various sectors. Computers always have to know where things are. They're always indexing and pointing to different places in the memory. So I don't believe that it would be an improvement in computer technology if the claim was drafted directly to that. But I don't believe the claim is drafted directly to that. The claim is reciting a series of steps which are directed to an abstract concept. And, in fact, we had used Claim 1 at the district court. Unilock has moved to using Claim 5, which actually has now been invalidated through an IPR. But, for example, the Claim 2, the content of Claim 2, the method as described in Claim 1, where the first and second portions include blocks. So blocking data, that's kind of a concept, I think, Your Honor, that goes to your question, whether or not the computer technology that existed at the time was capable of tracking when and where data copying was stopping. That blocking is in the prior art. It's disclosed at Column 3, Lines 64 to 67 of the specification. But there might be a non-abstract idea here if it told you how to do the pausing and how to do the restarting and how to do the saving, but it doesn't tell you any of that. It just tells you to do it. You're right, Your Honor. That's what the claim says. And when you look at the specification, it talks about indexing and pointers, which, as you indicated, does not elevate this outside of the abstract realm. Okay. Are there any further questions on the 229? I think we're okay. If not, I'm happy to cede the rest of my time. Good. Thank you. Thank you. Thank you. Mr. Foster? Judge Dyke, you had asked me about the intellectual ventures case. Actually, there are four intellectual ventures, one-on-one cases, but I think the one you were asking me about was intellectual ventures versus Erie Indemnity Company, 850F1315, which I have in front of me. And I see the statement you're talking about, which talks about an index. And I refer you, whoever is taking notes, to pages 1326 and 1327. The claims in that case were directed to a database, and the claims were dealing with creating and searching a database, which is a different type of invention than we are talking about in this case. And there is language there saying under Step 1, we agree with the district court that the invention is drawn to the abstract idea of creating an index and using that index to search for and retrieve data. This respectfully suggests that the purpose of the index is different in that case. How is it different? Excuse me? How is it different? Well, in our case, it's being used simply as a location for the computer to come back in and start the copying process. It's not being used for searching. Well, it's identifying a location, right? Which is the same thing in intellectual ventures. It is used, well, index is used to note a location, yes, but it's used for a different purpose. It's used for, you had asked before about how is it done. It tells how it's done. That's its purpose in the claim. Thank you. Thank you. Thank you both. The case is taken under submission.